The next case is Stern v. City of New York. May it please the Court, my name is Andrew St. Lawrence and I'm appearing today on behalf of the appellant Mitchell Stern. This morning I want to specifically the requirement of corroboration for an adverse inference instruction when there is negligent, as opposed to a more culpable level of intent, spoliation of evidence. And one of the key issues in this case, which was extensively briefed, is the fact that there was at one time a videotape of the entirety, or at the very least a very large portion, of the incident that gave rise to Mr. Stern's arrest that was maintained pursuant to the video camera procedure policy of the Department of Finance. Just to give a little bit of background, the Department of Finance, through its Sheriff's Department, set out to tow Mr. Stern's vehicle the morning of December 16, 2009. As part of the policy, whenever they are engaged in what is called a scoff tow, there is a video camera operator who is an employee of the contracted towing company who is there to videotape the entire encounter between the person whose vehicle is being towed, the Sheriff's Department, any responding officers, and there are fairly detailed instructions about what is supposed to be captured on that videotape and how that tape is supposed to be maintained. In this case, there was testimony from She had videotaped the entirety of the incident involving Mr. Stern, her father, Mr. Tony Rodriguez. Not the entirety of the incident, correct? She did not videotape the portion of the case that went to the excessive force claim, isn't that correct? That's correct, Your Honor. She testified that she videotaped at least up until the point that the police arrived. But she never actually looked at the videotape herself to determine if, in fact, it was all recorded, correct? That's correct, Your Honor. The evidence at the trial, which was undisputed, was that she took the tape from the camera, gave it to her father, Tony Rodriguez. Mr. Rodriguez testified that he then handed it to Deputy Sheriff Sergio Buchanum, who was the, quote, recorder that day, meaning he was the officer responsible for maintaining the tape. Deputy Sheriff Buchanum was a defendant in this case, is a defendant in this case, and he testified at trial that he had no recollection of receiving the tape, ever seeing the tape, having anything to do with the tape that day. But he did admit it was his handwriting on the tape. So the question, obviously, and ultimately, at the end of the day, the, quote, original videotape, which was admitted as Exhibit 200, only contained approximately 30 seconds of videotape footage. It is in the joint appendix. We've got it in the record. Thank you. Thank you, Your Honor. And that's really all we know about the circumstances of the erasure. I mean, we don't know anything else from the record, or I couldn't discern anything from the record, as to how it came to be the case that there was a portion of the videotape, or a portion of the incident that was not reflected on the videotape. Yes, Your Honor. I mean, the – Whether it was an erasure or a malfunction of the equipment. Well, as to the second point, there was testimony from the plaintiff's expert, Edward And he testified in some detail as to how that appeared and how he was able to determine it. With regards to the Court's question about the chain of custody, you know, for lack of a better record, a lack of a better description, the issue on that point was the, quote, original videotape, this 8-millimeter tape, Exhibit 200, was not obtained by the defendants, despite the fact that it had been requested numerous times by plaintiffs, until July 2, 2015, which was 11 days before jury trial began. So there was a, for lack of a better word, a scramble to try to determine whether, to the extent there were, chain of custody documents. They were requested by plaintiffs. They were never disclosed by the defendants. And we never were able to explore how it came to be that this tape arrived at the Sheriff's Department and went, apparently, to another city agency, before ultimately ending up in the office. Wasn't there something in the record about the fact that there was a belief it ended up in the Department of Investigation because of a complaint that your client had made against you? Yes, Your Honor. There was. Mr. Stern had made a complaint with the Department of Investigation about this incident. He had also complained to the New York City Police Department in December 2009, as well as the Civilian Complaint Review Board, who did a full investigation.  complaint? I believe that's the case, Your Honor. But again, the question is, how did it end up there in terms of what were the records of the maintenance of that? So the legal point I want to make with regards to the videotape is just addressing this issue of corroboration, because the district court, in issuing its decision on plaintiff's post-trial motions, did find that Mr. Stern had satisfied two of the three elements required under this Court's standard for spoliation. Specifically it found that there was a duty to maintain the videotape because there was a specific directive by the Department of Finance that it be so maintained. And furthermore, the district court found that there was at least a negligent standard, and he found that that could be proven by the simple absence of the recording. What he did not find and why he found an adverse inference was not warranted was he did not find that there was corroboration, that the evidence would have been, quoting the Court's standard, helpful to the party seeking the instruction, that is to say, helpful to Mr. Stern. And in reaching that conclusion, I believe he implied an incorrect standard of law. This Court has required only that the — there be sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction, meaning that there simply has to be a prima facie showing that that evidence would have been helpful for the person asking for the instruction. And in fact, in the Bernie v. Town of Cromwell case, which is cited in the briefs, this Court has described this requirement as, quote, any likelihood that the destroyed evidence would have been of the nature alleged by the party affected by its destruction. Is it whether to give an instruction ultimately a discretionary matter for the Court? Yes, it is. And weren't there a number of factors here that would have suggested that it was appropriate to exercise a discretion not to give that instruction? It wasn't clear how the tape was erased. It wasn't clear if it was erased. The individual, Soller, I believe her name, who took the photographs hadn't looked at it to ensure that it had been recorded. Why didn't all of these factors suggest that it was a sound exercise of discretion not to give the instruction? And originally, the Court had allowed your expert to testify about it and had said, in effect, well, I'm not going to give the instruction, but I'll let you make arguments. So I know you have a claim later about being undermined in that regard. Yes, Your Honor. But why isn't that initially an appropriate exercise of discretion? Your Honor, in the first instance, the abuse of discretion standard does include errors of law in this context, as the Court said in Burning. And I believe that the district court did err as a matter of law in not finding corroboration present here. But that's a post-trial decision. I'm talking about the decision during the trial, the discretionary decision not to give that instruction. There were a number of factors that supported, it seems to this Court, the discretion of the judge not to give an adverse inference instruction. And then later what happened was the — during the summation, I don't know if this is your summation, but it was a statement made for which there was certainly no direct evidence, which is what the judge said, and very, very little circumstantial evidence in which you said it was — the tape was erased by the deputy. Yes, Your Honor. So it seems like all of the decisions here were within the sound discretion of the trial judge. Why is that not the case? Well, Your Honor, just to go back another step, in terms of the decision the trial court made at trial immediately following Mr. Primo's testimony was not a decision a lengthy explained decision, unlike the post-trial decision. And I'm assuming, for the purposes of this appeal, the district court relied on the same logic for both decisions. In terms of the exercise of the discretion, having found that an adverse instruction was appropriate under the law, which is, I think, the question that you're asking me, Judge Amman, the purposes of an adverse instruction, as the Court — this Court said in Chin, is to deter parties from destroying evidence, to place the risk of the testimony's evaluation of the evidence on the party responsible. But here we have no idea how it — assuming it was erased, there's just no evidence as to how that happened, none. Well, Your Honor, that is, again, the responsibility of the defendants in the terms of the way that this tape was disclosed, the timing of the disclosure of this tape, and the impossibility of establishing a chain of custody. Again, this is — I'm sorry, I'm well over my time. Should I continue? Please answer the question. Yes. Under those types of circumstances, the — all of these purposes outlined in Chin would militate in favor of an adverse instruction because the party, with the complete access to the documents, information, and personnel, which is this Corporation Council of the City of New York, then has the onus of going through its records, identifying the responsible personnel, and putting for the jury the explanation for its destruction. That it would deter negligence by the city in connection with the way in which it maintains its records. That is one of the purposes of the adverse inference instruction. By the way, the instruction should not have been given with respect to the two police officers, correct? That — it should have been given only with respect to Deputy Sheriff McKenna. That is correct. I'm sorry. Which would have been very confusing to a jury, correct? Your Honor, I would have — I would have taken the opportunity to explain that confusion. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. My name is Ingrid Gustafson, appearing on behalf of the City and the individual defendants in this case. The district court here correctly declined to grant a new trial. Over the course of six days, all of these issues were, in fact, vetted. Plaintiff has never disputed that there was ample evidence adduced at trial that to support a jury conclusion that there was probable cause to arrest for obstructing governmental administration, which was the charge for which he was originally arrest, or to reject the excessive force finding. There was no miscarriage of justice here. But, of course, I'd like to turn straight to the video. I first want to address this chain of custody issue and put this back, I think, into context about the original recording that was, in fact, revealed later, absolutely. But this was not a case where a plaintiff was unaware of a video prior to that disclosure. Plaintiff knew very soon after this incident, when his criminal defense attorney subpoenaed the video, that there was a video, and, in fact, that it showed substantially the same as what the original video was. He knew this back in 2010. There was absolutely no – He didn't have the original video in 2010? He didn't have the original, but he knew there was a video. So there was absolutely no reason why he couldn't have requested the chain of discovery documents in – during discovery himself. I mean, he made a point of interviewing the district attorney – sorry, excuse me, the criminal defense attorney about chain of custody. He obviously at the – there was questioning chain of custody of the copy? Of the copy, absolutely. But there was no reason why he couldn't have gone to the sheriff's department and asked at that time, I would like to depose a records clerk, I would like to determine what happened to the video. There was nothing – this late disclosure did not change anything with the chain of custody. When there was a late disclosure, plaintiff – the defendants turned over all evidence, new evidence that came with that. And that – really what that was was the Department of Investigation file. The district court here ordered the defendants to follow up on certain chain of custody issues, and defendants complied with that. They looked again for a chain of custody documentation. It simply didn't exist. Talks to a new individual as requested by plaintiff to determine if they remembered what happened to the video. It didn't. But this is all post-finding the original tape? That's correct. This is all after the original video. All of these issues were vetted. And I strenuously object to the idea that it is still – it is – it is somehow this shifts the burden on the adverse inference instruction to defendants. Plaintiff has not cited a single case for that proposition. An adverse inference instruction is a very extreme sanction, and plaintiff bears the burden of proof of showing that the three – that the three requirements are met, and, of course, there are additional discretionary factors. Do you believe the first two requirements were met? Absolutely not, Your Honor. And I actually did not read the district court – the post-trial district court decision, which actually is a little bit different than the one that the district court reached prior to trial, following the motions in Lemonet. I don't believe there was any finding that there was enough evidence that Deputy Buchanian had erased the tape while it was in his custody, which is the first requirement of an adverse inference instruction. The Court did state there was some evidence that – that Deputy Buchanian had the tape at one point in time, and that there was evidence that there was a, quote, record erasure. And all that that means is that someone hit record at some point in time, as explained by plaintiff's expert. I don't take that to be a finding of sufficiency. Really what the Court was skipping on, saying the second finding was at most there's negligence, and you haven't shown that it's relevant as construed in this circuit, which is the third requirement. And this is – this is plaintiff's main contention, I think, on here at oral argument, that that was a legal error. And I disagree. The district court cited several cases, including Zubalake, and also residential funding, which was a – which is a decision of this court, which both discuss that when you actually – when you only have negligence, you do actually – there is more proof that is needed of relevance in the sense of the evidence is of the nature that you claim it's going to be. And the reason why is because if you have bad reading of evidence of negligence you have to have a good reading of Stern's testimony enough for that. I think it was – here it was self-serving. Every – all of these cases are done on a case-by-case basis, Your Honor, as Your Honor was discussing earlier. The – here we had seven witnesses who were there, who were going to testify at trial, who the jury was going to be able to determine, make a credibility determination. So really, it was fully within the Court's discretion to say – to look at that and say, you know, I have two differing versions, and I'm not going to put my – my thumb on the scale. And I don't think that just saying the video is going to show what I say it's going – it's going to show is, in fact, enough. But as – as you pointed out, Judge Emmen, on plaintiff's argument, there were additional factors that were – that were at play here. And I think that these are very powerful. In addition to the number of witnesses, it isn't clear that the video ever existed. And furthermore, plaintiff never explained how exactly the adverse inference instruction would work. How do you draw an adverse inference about the – Kagan, isn't it clear that the video ever existed? It isn't clear. I'm sorry. I must have misspoken. That there – how exactly would an adverse inference instruction just be framed against Deputy Buchanan? I mean, these were all factors that the trial court considered, and it was fully within the Court's discretion. The evidence here was so scanty that even if it – that we – there were to be a finding that it's on the other side of the speculation, which I don't think it is, but even – even if there were, it's so scanty that it was fully within the Court's discretion not to give the adverse inference instruction. I would also – I would like to talk about the – this – the instruction that was given at the end of trial that – and I would like to point out that the language of that instruction was agreed to by the parties. Plaintiff did not object to the language of the instruction, although obviously objected to it being given. I want to put that back into context, too. In plaintiff's interpretation, that instruction wiped out everything with the video. And I think that's incorrect, if you look at the record as a whole. This – the portion of the summation where Plaintiff's counsel is talking about the video and the inferences that can be drawn from it is actually about eight pages long in the record. And it's about six pages in after Plaintiff's counsel has been able to argue the video extensively. Has it – nobody objected? The District Court let Plaintiff – let Plaintiff's counsel say, invite the jury to draw – to draw an adverse inference to say, and the videotape magically disappeared when it got into McCannuman's hands, allowed Plaintiff to argue that the video would have supported his version of events and they should infer that it supported his version of events. There were all sorts of other arguments that Plaintiff's counsel was able to make about the video. The only one that Plaintiff's counsel could not make was the direct factual statement that Deputy McCannuman erased the video, which there was no evidence of in the record. And, I mean, the District Court judge here was – one of the reasons among many that we defer to District Court judges in these situations is the District Court was there and knew in context how that statement would sound, which we don't – and on that basis, in the context, determined that Plaintiff was making an improper factual claim. I do think it was within the Court's discretion to – to – to grant defendants' requests for an adverse inference instruction. But I think that even if this were found to be some sort of error, this is not substantially prejudicial. This really is a harmless error because, again, Plaintiff was allowed to put on all of the evidence that he had about the videotape throughout trial. Certainly, Plaintiff's counsel was allowed to make many other arguments, was allowed to walk right up to the line on summation. There was this one statement that she – that Plaintiff's counsel was not allowed to directly say, and that there was a curative instruction, there's – there is no direct evidence. I don't see how that would be a miscarriage of justice and warrant a new trial, although I don't think it's an abuse of discretion as an initial matter. Just as a final point, I did – I did want to very briefly – I did want to very briefly discuss the – the – just mention the Morris v. Fousteau point, I mean, because the other significant half of this case would be the objections to the jury instructions and to the sufficiency of the evidence. But I think that Morris is very clear that if a Plaintiff has an objection to a portion of what is being sent to the jury on a claim which will produce an ambiguity, you know, a general verdict will produce an ambiguity, the Plaintiff has the – has the obligation to also preserve the ability to show that that's prejudicial. I mean, you can preserve the objection. So just – I just want to make sure I understand your argument. So the – the argument is that objecting to the jury instructions was not adequate. You also, in the circumstances of this case, knowing that there were two theories that were going to be submitted to the jury, have to ask for a special verdict in order to preserve that objection. Absolutely. I think that's exactly what Morris said. In Morris, there was a Rule 50 motion. There's no question that the Plaintiff said there was insufficient evidence. That was preserved. What the Plaintiff didn't do – oh, excuse me, what the defendants didn't do in that case was preserve any sort of objection to the general verdict. And I – the Plaintiff's argument here – I see my time is up, but if I may finish this point – appears to be that if he objects to any part of the jury instructions, that preserves the – his recourse to the general verdict rule. And I think that as a – that's contrary to Morris, and I think that it's generally – it's not an accepted principle of law that objecting – for example, if he had objected to the obstructing instructions here, that wouldn't have preserved an objection to the – you can't transfer an objection. And just because there's that one phrase in Morris, and to otherwise object to the you didn't ask for a special verdict sheet, you didn't ask for special interrogatories, or otherwise object to the jury instructions, I think read in context, you know, as the jury was instructed to deliberate, so that this was prevented from being ambiguous. And I saw nothing in Plaintiff's reply brief that would draw any legally significant distinction between Morris and this case. Of course, it would have been helpful if the defense had asked for that special verdict as well, knowing that there were issues, correct? It would have been helpful, but considering that Plaintiff is the one who is trying to now take advantage of it, it was Plaintiff's obligation to preserve the objection. Obviously, you could imagine a situation in which defendants would be in the same situation as they were in Morris. If you don't have no further questions, thank you very much. So just to respond to a few points, hopefully quickly, the defense counsel has repeated it's not clear if the video ever existed. It is clear the evidence from Nicole Sawler was subject to cross-examination. She testified consistently throughout that she knew what she was doing, this was not the first time she'd done this, and that she recorded up until at least the police officers had arrived. With regards to Judge Ammon's recent question about corroboration under Zubalocki, I believe all three of the Zubalocki elements were met, applying a negligence standard, including the element of corroboration. The district court actually cites, too, the Assenter v. Cumberland Farms case, which is the Northern District of New York. You say corroboration has been met. Yes. But I thought your point before was there wasn't a necessity to show corroboration. For negligence, it is a necessity to show corroboration. I agree with that. And if there's the Court's proceeding on a negligence basis, the contents of the tape were adequately corroborated by the sworn testimony of the Plaintiff, Mitchell Stern, which is the same fact pattern that proceeded in Assenter. With regards to the case-by-case analysis, and obviously this is a case-by-case determination, as the defense counsel has pointed out, the reason it was an abuse of discretion not to give an adverse inference instruction here is because of the centrality of this videotape to this case. Had that videotape been preserved such that Plaintiff or defendants, much less the judge and the jury, could have seen it, it may well have avoided the need for a trial altogether. Can you explain that for me? Because as I think you conceded at the very beginning of your oral argument, the tape would not have shown anything – well, shows events only up to the time that the police officers arrived. At least up until the police arrived. And you don't dispute that? Well, Nicole Saller could not remember the exact extent to which the tape extended. But you're relying on a description of the tape. You're relying on her testimony. Is that correct? Well, I'm relying on her testimony with regard to the tape. It would have shown at the very least the circumstances under which Mr. Stern entered his vehicle, which is not in dispute, and the circumstances that – when he left the vehicle. Their obstruction of governmental administration theory was based on their allegation, their testimony, that he entered the vehicle without permission, remained in the vehicle without permission, at least until the police officers arrived at the scene. It would have shown that. And in the absence of that, the absence of probable cause for obstruction of governmental administration, there is no defense. And that's why I think this tape would have been central to any decision by any factfinder here. It's not a case like Chinn where it's a secondary or potentially – Was there also not a disorderly conduct charge? There was also a disorderly conduct charge, which is part of a separate part of the appeal, which I believe should not have been charged to the jury, which I did properly object to. I know I'm over my time. If there's no further questions, I'll – Do you agree, though, that the culpable state of mind here was negligence? I don't. I think we – I think the adverse inference could have been drawn on a willful or intentional standard as well, and I believe the facts showed it. But even under a negligence standard, Your Honor. Thank you very much. Thank you both. I'll take the matter under advisement.